**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       **Plaintiff,**<br><br>  **v.**<br><br>JAMES ANDREW STILES, Jr.,<br> a/k/a "Andrew Stiles," and<br>EDWARD GRAY STILES, Jr.,<br> a/k/a "Gray Stiles,"<br>       **Defendants.** | <u>**COMPLAINT**</u><br><br>**Case Number:**<br><br><br><u>**JURY TRIAL DEMANDED**</u> |

   Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against Defendants James Andrew Stiles, Jr. and Edward Gray Stiles, Jr. and alleges as follows:

<u>**SUMMARY**</u>

   1.  This case involves insider trading by James Andrew Stiles ("Andrew Stiles") and Edward Gray Stiles, Jr. ("Gray Stiles") (collectively "Defendants") in the stock of Eastman Kodak Company ("Kodak"), as well as insider trading by Andrew Stiles in the stock of Novavax, Inc. ("Novavax").

   2.  Andrew Stiles worked at Phlow Corporation ("Phlow"), a medicine supply chain company that was assisting Kodak in obtaining funding from the federal government to produce key starting materials ("KSMs") and active pharmaceutical ingredients ("APIs") required to produce medicines with a focus on responding to the COVID-19 pandemic. While the funding was being negotiated, but before the government's interest in funding Kodak had been publicly announced, based on material, nonpublic information that Andrew Stiles had obtained by virtue of his employment at Phlow, Andrew Stiles purchased Kodak stock in breach of a duty of trust

and confidence he owed to Phlow. After the government's interest in funding Kodak was announced to the public, Andrew Stiles sold the shares at a profit of approximately $553,000.

3.     In further breach of the duties he owed to Phlow, Andrew Stiles used this material, nonpublic information to tip his cousin and close friend, Gray Stiles, to trade Kodak securities before any public announcement about Kodak's negotiations for federal funding. Gray Stiles profitably traded Kodak securities based on that material, nonpublic information, realizing gains of approximately $990,000.

4.     Before, and for a brief period, concurrently with, his employment at Phlow, Andrew Stiles was employed at BDO USA, LLP ("BDO"), an accounting and consulting company. BDO had a master consulting services agreement (MSA) in place with Novavax, a pharmaceutical company. In connection with Andrew Stiles's employment at BDO, he assisted Novavax's efforts to procure over $300 million in funding to support its efforts to develop a coronavirus vaccine. While the funding was being negotiated, but before it had been publicly announced, based on material, nonpublic information that Andrew Stiles had obtained from Novavax, Andrew Stiles purchased Novavax stock in breach of duties of trust and confidence he owed to BDO and Novavax, which he sold after the information about funding became public, realizing gains of over $45,000.

5.     By engaging in the conduct described above, Andrew Stiles and Gray Stiles violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], and unless enjoined will continue to engage in transactions, acts, practices, and courses of business similar to those alleged in this complaint.

6.      The Commission seeks a final judgment enjoining the Defendants from future

violations of these same provisions of law; ordering the Defendants to pay a civil monetary

penalty; and ordering each of the Defendants to disgorge the illicit gains they individually

received, together with prejudgment interest thereon.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to Sections 21(d) and 21A of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78u-l], to enjoin such acts, practices, and courses of

business; and to obtain disgorgement, prejudgment interest, civil money penalties, and such other

and further relief as the Court may deem just and appropriate.

8.      The Court has jurisdiction pursuant to Sections 21(d) and (2), 21A, and 27 of the

Exchange Act [15 U.S.C. §§ 78u(d) and (e), 78u-l and 78aa].  The Defendants have, directly and

indirectly, made use of a means and instrumentality of interstate commerce, of the mails, or of a

facility of any national securities exchange in connection with the conduct alleged in this

Complaint.

9.      Venue lies in this judicial district pursuant to Section 27 of the Exchange Act [15

U.S.C. § 78aa].  Among other things, certain of the acts, practices, and courses of business

constituting the violations of the federal securities laws alleged herein occurred within the

Southern District of New York, including that the securities at issue were traded on the New

York Stock Exchange ("NYSE") and the NASDAQ Stock Market LLC ("NASDAQ"), both of

which are located in this District.

## DEFENDANTS

10.     **Andrew Stiles**, age 37, is a resident of Charleston, South Carolina.  From 2009

until on or about May 26, 2020, he was employed by BDO USA, LLP, and at all relevant times

he was a Managing Director in the Biodefense & Government Contracts group.  Beginning on or

about May 1, 2020, through on or about October 2021, he was employed by Phlow Corporation

as Vice President of Government Initiatives and Contract Compliance.

11.    **Gray Stiles**, age 37, is a resident of Richmond, Virginia.  Gray Stiles's father and

Andrew Stiles's father are brothers.

## RELATED INDIVIDUALS AND ENTITIES

12.    **Phlow**, an essential medicines supply chain company, is a Delaware

corporation headquartered in Richmond, Virginia.  It was founded in early 2020.

13.    **Kodak**, a print and chemical company, is a New Jersey corporation headquartered

in Rochester, New York.  Kodak's common stock is registered with the Commission pursuant to

Section 12(b) of the Exchange Act, and trades on the NYSE under the ticker symbol "KODK."

14.    **BDO**, an accounting and consulting company, is a Delaware limited liability

partnership headquartered in Chicago, Illinois.

15.    **Novavax**, a pharmaceutical company, is a Delaware corporation headquartered in

Gaithersburg, Maryland.  Novavax's common stock is registered with the Commission pursuant

to Section 12(b) of the Exchange Act, and trades on the Global Select Market of the NASDAQ

under the symbol "NVAX."

## FACTUAL ALLEGATIONS

**I.    Insider Trading in Kodak Securities**

**A.    Kodak's Efforts to Obtain Funding from the U.S. Government**

16.    In or about late March and early April of 2020, Kodak was exploring the

possibility of converting some of its unused or underused resources for processing film to the

processes associated with producing pharmaceuticals.  Specifically, Kodak was looking to begin

producing chemicals such as KSMs and APIs that are necessary for the production of generic

medicines, in an effort to combat COVID-19 by strengthening the domestic pharmaceutical supply chain. Continuing from April of 2020 through the end of July of 2020, a core group of top employees at Kodak worked on a confidential project with the code name "Project Tiger," which involved preparing a proposal to obtain funding from the federal government for the purpose of developing pharmaceutical production capabilities at Kodak. Kodak engaged extensively with the federal government, including, but not limited to, the Office of Trade and Manufacturing Policy ("OTMP") at the White House, and the United States Department of Health and Human Services ("HHS"), as well as with private companies, including Phlow and a technical consultant, Consulting Company A.

17.     During Kodak's initial calls to federal agencies, an official at the Biomedical Advanced Research Development Agency ("BARDA") put Kodak in touch with Phlow's CEO who was also seeking funding to domestically produce APIs. Phlow's CEO supported Kodak's efforts to secure funding with the ultimate objective of Kodak partnering with Phlow to manufacture KSM. In late March 2020, during an initial call between Phlow and Kodak, Phlow's CEO explained that he was already in touch with the White House regarding domestic pharmaceutical chemical manufacturing opportunities, and directed Kodak to OTMP.

18.     On April 2, 2020, Kodak's leadership participated in an initial call with a senior policy analyst at OTMP. Kodak's leadership continued to talk with this senior policy analyst at OTMP on and off through April and May.

19.     On May 22, 2020, the Director of OTMP joined a conference call with Kodak leadership. The Director of OTMP indicated his interest in securing government funding for Kodak and requested that Kodak put together a funding proposal.

20.    On May 28, 2020, Kodak, with some assistance from Phlow's CEO, submitted a proposal to OTMP requesting $435 million to $575 million in funding.  The Director of OTMP and the senior policy analyst at OTMP then told Kodak's leadership that they would need to apply to the International Development Finance Corporation ("DFC") for the funding, that the funding vehicle would be a loan, and that Kodak would need to put together a more detailed proposal by June 3, 2020.

21.    Kodak retained a technical consultant, Consulting Company A, to assist it with the loan application proposal.  On May 29 and 30, 2020, Kodak entered into non-disclosure agreements ("NDAs") with both Phlow and Consulting Company A, so that Kodak could freely share confidential information with them while they assisted Kodak with their proposal to the DFC.  Under these NDAs, both Phlow and Consulting Company A agreed not to use Kodak's confidential information for any purpose other than advising Kodak with respect to the loan application process, and agreed not to disclose the information to anyone except as needed for the purpose of advising Kodak on the loan application process.

22.    On June 3, 2020, Kodak submitted an initial loan proposal requesting $640 million in funding to the senior policy analyst at OTMP and the DFC.  When the DFC indicated that they wanted a guarantee that Kodak would have a customer for its KSMs, Phlow's CEO arranged for Phlow to sign a letter of intent with Kodak indicating that Phlow planned to use Kodak's KSMs for its APIs.

23.    On June 26, 2020, Kodak submitted its updated official application to the DFC requesting a $655 million loan.  Ultimately, by mid-July, Kodak and the DFC focused on negotiating a $765 million loan.

24.     In the interim, the Director of OTMP tasked the CEO of Phlow with "pitching" the Kodak loan, and he asked Phlow's CEO to sit in on a meeting at the White House with the Secretary of HHS and others to brief them on the Kodak DFC loan opportunity.  Phlow's CEO attended this meeting on June 17, 2020, where Kodak and a few other potential pharmaceutical opportunities were discussed.  Materials handed out during this meeting indicated that Kodak was the only company that had submitted an application to the DFC loan program at that time, and that a letter of intent from the DFC was expected around the end of June 2020.

25.     On July 22, 2020, the DFC sent a loan officer to Kodak's headquarters for a site visit, and while there, the loan officer told Kodak that the DFC wanted to enter into a Letter of Interest ("LOI") with Kodak for a proposed $765 million loan.

26.     By Friday, July 24, an official press conference to publicly announce the DFC's LOI with Kodak had been scheduled to take place at Kodak's headquarters with the head of the DFC, Department of Defense officials, and potentially the President of the United States, in attendance.  That same day, the senior policy analyst at OTMP called the CEO of Phlow to invite him to the press conference (he did not attend).  That press conference was scheduled for Tuesday, July 28.

27.     At 6:00 a.m. on July 28, the Wall Street Journal published an article about the potential loan, and the official press conference was held at 4 p.m. that day.  Following the Wall Street Journal article, the price of Kodak stock rose from a closing price of $2.62 per share on July 27 to a closing price of $7.94 on July 28.

28.     On July 29, after the official press conference was held and additional details released, the price of Kodak stock reached an intra-day high of $60 per share, and closed at $33.20 per share.

**B.      Andrew Stiles Learned Material Nonpublic Information Regarding Kodak
          While Employed By Phlow**

29.      From on or about May 1, 2020, through October of 2021, Andrew Stiles was

employed at Phlow as Vice President of Government Initiatives and Contract Compliance.

30.      At all times pertinent to this complaint, through his position at Phlow, Andrew

Stiles learned material nonpublic information relating to Kodak and its business, including

financial performance, products, and potential corporate transactions, including the information

discussed in more detail in this complaint.

31.      In his role at Phlow, Andrew Stiles attended regularly-held executive committee

meetings where Phlow's CEO provided updates on the status of Kodak's funding proposal.

32.      On May 29, 2020, Phlow and Kodak entered into an NDA, and that afternoon

Andrew Stiles recommended to Phlow's CEO that Kodak hire Consulting Company A as a

technical consultant to assist Kodak with its funding proposal.

33.      On or about June 16, 2020, Phlow's CEO sent an email updating Phlow's

executive committee, including Andrew Stiles, that he would be attending a meeting at the White

House with the Secretary of HHS and others.  Phlow's CEO was invited to this meeting to

"pitch" the Kodak loan opportunity to the government, and updated Phlow's executive

committee regarding the government's continued interest in Kodak shortly thereafter.

**C.      Andrew Stiles Traded On the Basis of, and Tipped, Material Nonpublic
          Information in Violation of a Duty Owed to Phlow**

34.      At all times pertinent to this complaint, Andrew Stiles owed a duty to Phlow to

maintain the confidentiality of material nonpublic information obtained during the course of his

employment with Phlow, including material nonpublic information regarding companies with

whom Phlow had a contractual relationship.

8

35.     On or about April 17, 2020, prior to being hired at Phlow, Andrew Stiles signed a "Potential Employee Nondisclosure Agreement" where he agreed to keep "in strict confidence" all information disclosed by Phlow or any of its employees during the application process.  A few days after accepting employment as Vice President of Government Contracts and Compliance at Phlow on or about April 20, 2020, the CEO of Phlow sent Andrew Stiles Phlow's draft EEO, Ethics, and Business Conduct Policies, writing, "see attached."   The draft included a section on "Protecting Confidential Information," which noted that "[g]iven the nature of our work with the U.S. Government, our contracts generally require strict confidentiality," and barred employees from disclosing "any third-party confidential information."

36.     This same document was forwarded to Andrew Stiles again on June 5, 2020, this time by an HR manager, who noted that it was sent "to BARDA back in the day (April)," and that she was working on a draft employee handbook for Andrew Stiles to review (in his role as VP of Government Contracts and Compliance).

37.     On June 23, 2020, the HR manager sent Andrew Stiles the draft Employee Guidebook.  This Guidebook expanded upon the earlier document's confidentiality policies, noting that employees "may have access to confidential, secret, and proprietary information" during the course of their employment, and that employees must keep such information confidential and not use it for their individual benefit.

38.     Notwithstanding his obligation to maintain the confidentiality of material nonpublic information obtained during the course of his employment with Phlow, Andrew Stiles traded on material nonpublic information about Kodak obtained during the course of his employment, as detailed herein, and tipped that same material nonpublic information to Gray Stiles, knowing or recklessly disregarding that Gray Stiles would trade on such information.

9

39.     At all relevant times, Andrew Stiles and Gray Stiles were cousins and close friends.  They grew up together in Ashland, Virginia, communicated regularly via text messages and telephone calls, and socialized in person.  Gray Stiles was a groomsman in Andrew Stiles's wedding in June 2019.

40.     On May 21, 2020, Gray Stiles texted Andrew Stiles regarding investing in companies with government contracts for coronavirus vaccine research.  Andrew Stiles responded that the better investment was in companies where a government contract had not yet been "officially awarded," and that he "has a pulse on a couple" and would fill him in later. Gray Stiles asked Andrew Stiles to keep him posted – knowing that Andrew Stiles would have access to confidential information in this space through his employment working with companies in the pharmaceutical industry and their government contract proposals.

41.     On June 3, 2020, based on material nonpublic information about Kodak's attempts to secure funding from the federal government, Andrew Stiles purchased 11,600 Kodak shares for approximately $30,000.  He placed an order to buy an additional 25,000 Kodak shares after the market closed that day, which was filled at market open the next morning.

42.     At approximately 8:00 p.m. on June 3, 2020, Gray Stiles texted Andrew, "Anything on FSD pharma?  Looks like they just got some FDA approval on some COVID investigational drug."  Rather than respond via text, Andrew Stiles called Gray Stiles a few minutes later and the two spoke for approximately 10 minutes.

43.     On June 4, 2020, at approximately 9:25 a.m., on the basis of material nonpublic information provided by Andrew Stiles, Gray Stiles purchased 3,800 shares of Kodak stock.

44.     On June 5, 2020, on the basis of material nonpublic information, Gray Stiles and Andrew Stiles purchased an additional 1,100 and 4,172 shares of Kodak stock, respectively.

45.     During the weekend of June 27-28, Andrew Stiles and Gray Stiles got together in Richmond, Virginia.

46.     From June 29 through July 6, 2020, on the basis of material nonpublic information, Gray Stiles purchased an additional 2,100 Kodak shares, and Andrew Stiles used over $87,000 of his recently-rolled-over 401(k) money to purchase 38,827 Kodak shares in his new IRA account.

47.     On July 9, 2020, Gray Stiles texted Andrew Stiles a coded reference to Kodak stock, asking, "Any update on the film we sent off a few weeks ago to get developed?" Andrew Stiles responded, "600+. Maybe 2 weeks out" – a coded reference to Kodak's negotiations for a loan of over $600 million being announced in a couple weeks. During this time, as indicated supra at ¶¶ 22-24, Phlow's CEO was assisting Kodak with its efforts pursuing a DFC loan exceeding $600 million with a potential decision and announcement of a letter of intent anticipated in the coming weeks. Phlow's CEO shared this information with the executive team at Phlow, and Andrew Stiles was a member of that team.

48.     From July 20 through 22, 2020, on the basis of material nonpublic information, Gray and Andrew Stiles purchased an additional 6,940 and 629 shares of Kodak stock, respectively.

49.     On July 23, Gray Stiles texted Andrew Stiles again, "Any update on time frame? Everything getting destroyed this afternoon." After Andrew Stiles texted him back to be patient, Gray Stiles responded, "trying but more importantly I need to know how much to buy on dips." Both Gray and Andrew Stiles avoided overtly referencing Kodak in these messages as well.

50.     On Friday, July 24, on the basis of material nonpublic information, both Gray and Andrew added to their holdings, buying 2,300 and 2,000 additional Kodak shares, respectively.

51.     On the evening of July 26, the CEO of Phlow emailed Andrew Stiles and the other Phlow executives that Kodak's "big announcement" would be happening on Tuesday, July 28, and that the President of the United States was planning to attend.

52.     At approximately 7:23 am on July 27, Andrew Stiles texted Gray Stiles "Tmw" to which Gray Stiles replied, "Hot damn."

53.     Beginning just after the market opened on July 27, 2020, and continuing throughout the day, on the basis of material nonpublic information, Andrew Stiles and Gray Stiles purchased an additional 13,510 and 28,900 Kodak shares, respectively.  Gray Stiles's purchase on July 27, 2020 of 28,900 Kodak shares represent approximately 64% of his total purchases of Kodak shares.

54.     In total, from June 3 through July 27, 2020, Andrew Stiles purchased 95,738 Kodak shares for over $230,000, and Gray Stiles purchased 45,140 Kodak shares for over $104,000.

55.     On July 28, 2020, at 6:56 a.m. after the Wall Street Journal article on the DFC's LOI to provide Kodak with a $765 million loan came out, Andrew Stiles texted Gray Stiles an "Ok" hand signal emoji.

56.     Throughout the day on July 28, 2020, Andrew Stiles sold the entirety of his Kodak position for realized profits of over $553,000.

57.     On July 29, Gray Stiles sold half of his Kodak position, selling 23,300 Kodak shares at a price as high as $45/share.  Gray Stiles sold the rest of his Kodak position on August 3 and August 11, 2020, for total realized profits of over $990,000.

58.     Andrew Stiles tipped his cousin Gray Stiles as a gift, so that Gray Stiles could profit by trading in Kodak stock ahead of the public announcement of the government's interest in making a loan to Kodak.

59.     Andrew Stiles purchased Kodak securities, as alleged above, while in possession and on the basis of material nonpublic information about Kodak's efforts to obtain funding from the federal government, and tipped Gray Stiles with this same material nonpublic information, all in breach of his duty of trust and confidence to Phlow.

60.     The information that Andrew Stiles traded on and tipped to Gray Stiles about Kodak's efforts to obtain federal funding was material and nonpublic.

61.     Andrew Stiles knew, recklessly disregarded, or consciously avoided knowing that the information he possessed and tipped to Gray Stiles about Kodak's efforts to obtain federal funding was material and nonpublic.

62.     Andrew Stiles knew, recklessly disregarded or consciously avoided knowing that, by trading on Phlow's confidential information regarding Kodak and tipping Gray Stiles with this information, as alleged above, he was breaching his duty to Phlow.

63.     Andrew Stiles tipped Gray Stiles for personal benefits, including the benefit of making a gift of material nonpublic information to a family member and friend.

64.     Andrew Stiles intended for Gray Stiles to trade on the tip, and he knew or recklessly disregarded that Gray Stiles would use the tip to trade in Kodak securities.

65.     At the time of his trading in Kodak securities, Gray Stiles knew that Andrew Stiles worked with companies in the pharmaceutical industry and their government contract proposals, and had access to confidential information about companies pursuing government contracts and funding.

66.     Gray Stiles purchased Kodak securities as alleged above while in possession and on the basis of the material nonpublic information that he had received from Andrew Stiles. Gray Stiles knew, recklessly disregarded, or consciously avoided knowing that the information was material and nonpublic.

67.     Gray Stiles knew, recklessly disregarded, or consciously avoided knowing that the tips he received from Andrew Stiles were conveyed in breach of Andrew Stiles's fiduciary duty or a similar obligation arising from a relationship of trust or confidence.

II.     **Insider Trading in Novavax Securities**

A.     **Andrew Stiles Traded in Novavax based on Material Nonpublic Information he Learned While Employed By BDO**

68.     Prior to working at Phlow, Andrew Stiles was employed by the accounting and consulting company, BDO.  Through his position at BDO, Andrew Stiles learned material nonpublic information relating to Novavax and its business, financial performance, products, and potential corporate transactions, including the information discussed in more detail in this complaint.

69.     From 2009 until on or about May 26, 2020, Andrew Stiles was employed by BDO, and at all relevant times he was a Managing Director in the Biodefense & Government Contracts group.  Novavax was one of BDO's clients, and BDO and Novavax had a master consulting services agreement ("MSA") in place since August 2018.  Each project BDO performed for Novavax was outlined in a separate Statement of Work ("SOW") that referenced and was incorporated into the MSA.

70.     In mid-February 2020, Andrew Stiles learned from one of his BDO colleagues that Novavax was "going after" a coronavirus vaccine and may need support lobbying BARDA for funding, and the colleague suggested that BDO could provide those services.

71.     On April 15 and 17, 2020, Andrew Stiles participated in conference calls with Novavax executives to pitch BDO's services in lobbying BARDA and to learn about Novavax's planned BARDA funding application.

72.     On April 28, 2020, a Novavax executive confirmed to Andrew Stiles that Novavax would engage BDO to assist it with its coronavirus vaccine funding efforts.  The executive said Novavax would send the necessary paperwork that day, and expected to "hear something from BARDA very shortly."

73.     On April 29 and 30, 2020, Andrew Stiles got approval from BDO management to enter into a fourth SOW with Novavax to assist with its BARDA application, sent the BDO-signed SOW to Novavax, set up a call with Novavax executives for May 1 to discuss the SOW, and asked Novavax for a copy of the whitepaper Novavax had already submitted to BARDA earlier in April.  Novavax sent Andrew Stiles the whitepaper on April 30, noting that things were now moving at "WARP speed," and that BARDA may be looking to fund Novavax even sooner than they thought.  The whitepaper, marked "CONFIDENTIAL," laid out Novavax's interest in BARDA funding and the current status of their coronavirus vaccine research capabilities, estimating their funding needs at approximately $320 million.  The whitepaper also noted that Novavax might receive overlapping funding from the Coalition for Epidemic Preparedness Innovations (CEPI), a Bill Gates non-profit, and that it would notify BARDA if Novavax received such additional funding from CEPI.

74.     On May 1, 2020, Andrew Stiles dialed into a virtual meeting with Novavax executives to kick-off BDO's efforts to guide Novavax's BARDA application process.  Seven minutes into this meeting, Andrew Stiles purchased approximately $10,000 worth of Novavax stock (584 shares) while still in the virtual meeting.

75.     Continuing on May 1, 2020, Andrew Stiles dialed into a follow-up conference call with Novavax executives, to discuss Novavax's meeting with BARDA earlier that afternoon where BARDA requested a "rolling" submission, with the first component of the proposal (regarding immediate COVID-19 vaccine supply) to be submitted within a week.  Five minutes into that conference call, and while still on the call, Andrew Stiles purchased an additional 1,260 shares of Novavax stock.

76.     Andrew Stiles continued to work with Novavax on their vaccine funding efforts throughout early May 2020, and on May 8 recommended Novavax stock to Gray Stiles, who texted his girlfriend that Novavax stock was "something to watch."

77.     On May 12, 2020, Novavax announced that it had secured $384 million in funding from CEPI to develop a COVID-19 vaccine.  In response, Novavax stock price increased 62%, from $24.50 to $39.82 per share.

78.     On June 3, 2020, Andrew Stiles sold all 1,844 shares of Novavax stock for realized gains of over $45,000.

**B.     Andrew Stiles's Trading Violated Duties Owed to BDO and Novavax**

79.     At all times pertinent to this complaint, Andrew Stiles owed a duty to BDO to maintain the confidentiality of material nonpublic information obtained during the course of his employment with BDO, to include material nonpublic information regarding companies with whom BDO had a contractual relationship.

80.     While employed at BDO, Andrew Stiles was covered by their Code of Ethics and Business Conduct ("BDO's Code"), which required that all employees "maintain the confidentiality of information entrusted to them by the Firm or provided by our clients and vendors."  BDO's Code prohibited BDO employees from sharing confidential information with

anyone outside the Firm, "including clients, family and friends." Further, BDO's Code included an insider trading section, and prohibited personnel from trading in a client's securities while in possession of material nonpublic information concerning that client. BDO employees were required to annually certify, in writing, that they had reviewed and were complying with BDO's Code, and Andrew Stiles's last certification was on October 28, 2019.

81.     Andrew Stiles also owed a duty of trust or confidence to Novavax, and knew that Novavax expected all BDO employees to keep information shared between the two companies confidential. BDO had an MSA in place with Novavax, covering all of BDO's consultancy services as an independent contractor to Novavax. That agreement required BDO not to use any of Novavax's confidential information for BDO's "direct or indirect benefit or the direct or indirect benefit of any third party," and required BDO to maintain the confidentiality of such information. BDO further agreed not to "buy, sell or otherwise trade any securities of Novavax based on any material Confidential Information learned as a consultant of Novavax, or tip others to do so." When Andrew Stiles began providing Novavax with his services, he facilitated Novavax entering into a fourth SOW with BDO, and the SOW referred back to and incorporated the MSA. Based on these assurances that Andrew Stiles would maintain the confidentiality of Novavax's information, Novavax provided Andrew Stiles with materials that were clearly identified as confidential.

82.     As described above, Andrew Stiles purchased Novavax securities while in possession and on the basis of material nonpublic information about Novavax's efforts to obtain funding, which he learned through his consulting work with Novavax at BDO, in breach of his duties of trust and confidence to BDO and Novavax.

17

83.     Andrew Stiles knew, recklessly disregarded, or consciously avoided knowing that the information he possessed about Novavax's efforts to obtain funding to pursue a COVID-19 vaccine was material and nonpublic.

84.     Andrew Stiles knew, recklessly disregarded, or consciously avoided knowing that, by trading on confidential information regarding Novavax, he was breaching his duties to BDO and Novavax.

**CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(All Defendants)**

85.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 84 as if they were fully set forth herein.

86.     By engaging in the conduct described above, the Defendants, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (a) employed one or more devices, schemes, or artifices to defraud, (b) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (c) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

87.     By reason of the foregoing, the Defendants have violated, and unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Exchange Act Rule 10b-5(c) [17 C.F.R. § 240.10b-5(c)].

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court find the Defendants committed the violation alleged and enter a final judgment:

### Permanent Injunction

Permanently restraining and enjoining the Defendants from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### Disgorgement and Prejudgment Interest

Issue an order directing the Defendants to disgorge all ill-gotten gains received within the applicable statute of limitations, including prejudgment interest, resulting from the acts and/or courses of conduct alleged in this Complaint.

### Civil Penalty

Issue an order directing the Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

### Officer and Director Bar

Issue an order pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], barring Defendant Andrew Stiles from serving as an officer or director of any issuer that has a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

### Further Relief

Granting any other and further relief this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

**Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action and Defendants in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

**Demand for Jury Trial**

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Respectfully submitted,

Judson T. Mihok
Gregory R. Bockin*
Megan S. Ryan
Assunta Vivolo

*Attorneys for Plaintiff*

U.S. SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Phone: 215-597-3192
Fax: 215-597-2740
Email: MihokJ@sec.gov

February 22, 2023

*Application for admission *pro hac vice* to be filed.